UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SENECA INSURANCE COMPANY, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CIVIL FILE NO. 1:16-CV-00174-WSD |
| SAFEWAY GROUP, INC.; WH-TRI COUNTY SHOPPING CENTER, LLC; and KEITH MITCHELL, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| SAFEWAY GROUP, INC.; WH-TRI COUNTY SHOPPING CENTER, LLC; | ) |
| | ) |
| Third-Party Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| HAMBY & ALOISIO, INC., | ) |
| | ) |
| Third-Party Defendants. | ) |
| _____ | ) |

### SAFEWAY GROUP, INC. AND WH-TRI COUNTY SHOPPING CENTER, LLC'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COME NOW Safeway Group, Inc. ("Safeway") and WH-Tri County

Shopping Center, LLC ("Tri County") and submit their Brief in Support of Motion

for Summary Judgment as follows.

10597968 v4

## I.   __INTRODUCTION__

Seneca Insurance Company, Inc. ("Seneca") specializes in "complex" accounts such as multi-location shopping centers.   To increase the number of policies sold, Seneca incentivized agents with 20% commissions – above the industry norm – and incentivized insureds with discounted premiums.

In furtherance of the directive to increase sales, Seneca underwriter Mitchell Pluskalowski bound coverage with full knowledge the Safeway risk did not meet Seneca's underwriting criteria.   Mr. Pluskalowski ignored Safeway's loss history and its own underwriting guidelines.   ***Indeed, even Seneca's own underwriting expert admits he would not have bound coverage given the application information in Seneca's possession***.

Now, faced with the underlying claim brought by Keith Mitchell, a claim similar in nature to numerous others disclosed during the application process, Seneca falsely asserts Safeway failed to disclose crimes in its application thereby voiding the policy.   As a fallback position to its meritless claim for rescission, Seneca alleges Safeway *may have* failed to provide timely notice of Keith Mitchell's claim despite having *no evidence whatsoever* of prior knowledge by Safeway of the Mitchell incident or claim.   Moreover, Seneca failed to reserve its rights with respect to the underlying Mitchell claim and failed to claim rescission timely.   Seneca knew "facts" supposedly relevant to its claim of rescission as early

10597968 v4

as April of 2014 yet waited for almost two years before taking any action whatsoever. Seneca's allegations are without merit, and Safeway and Tri-County are entitled to summary judgment on each and every claim.

## II.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.  The Parties

Safeway manages shopping centers (the "Properties") including the Tri County Shopping Center. (First Shaikh Depo., p. 13). Tri County owns the Tri County Shopping Center. (*Id.* at p. 14).

Seneca Insurance Company, Inc. ("Seneca") is a liability insurer that specializes in complex risks such as the shopping centers managed by Safeway. (Pluskalowski Depo., p. 18, ll. 10-21). Seneca wanted to increase policies sold for 2014. (*Id.* at p. 22, ll. 14-24). Accordingly, Seneca incentivized agents with commissions of 20% – above the industry norm – and incentivized insureds with discounted premiums. (*Id.* at pp. 199, ll. 11-17, 178, ll. 24-25 and 198, ll. 4-6). The underwriter for the Safeway account was Mitchell Pluskalowski ("Pluskalowski"). (*Id.* at p. 16, ll.11-14).

Hamby & Aloisio, Inc. ("Hamby") assisted Safeway in the placement of its liability insurance, and Marty Friedman ("Friedman") of Hamby was the producer for the account. (Friedman Depo., p. 19, ll. 10-25). On October 8, 2013, Hamby

10597968 v4

completed and sent Seneca an application for Safeway's liability coverage for January 30, 2014 to January 30, 2015 (the "Initial Application").  (Ex. 39).

### B.      The Initial Application

The Initial Application contained the following question and answer regarding crimes on the Properties:  "18.  HAVE ANY CRIMES OCCURRED OR BEEN ATTEMPTED ON YOUR PREMISES WITHIN THE LAST THREE (3) YEARS?  N"  (*Id.* at SEN480).  The answer "N" meaning "No" was an inadvertent error contradicted by numerous other disclosures in Safeway's application materials.  (Friedman Depo., p. 45, l. 14 – p. 46, l. 12; *see e.g.*, Exs. 59, 61 and 90).  Seneca knew the answer to Question 18 was false as Mr. Pluskalowski admitted to seeing crimes listed on the loss runs attached to the Initial Application.  (Pluskalowski Depo., p. 66, ll. 4 – p. 67, l. 15).

The Initial Application contained the following information regarding loss history (the "Loss History Grid"):

**LOSS HISTORY**

ENTER ALL CLAIMS OR LOSSES (REGARDLESS OF FAULT AND WHETHER OR NOT INSURED) OR OCCURRENCES THAT MAY GIVE RISE TO CLAIMS FOR THE PRIOR 5 YEARS (3 YEARS IN KS & NY)

| DATE OF OCCURRENCE | LINE | TYPE/DESCRIPTION OF OCCURRENCE OR CLAIM | DATE OF CLAIM | AMOUNT PAID | AMOUNT RESERVED | CLAIM STATUS OPEN | CLSD |
|---|---|---|---|---|---|---|---|
| | | Loss runs on file with the underwriters | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

CHK HERE IF NONE — SEE ATTACHED LOSS SUMMARY

(Ex. 39 at SEN467).

10597968 v4

The Initial Application also informed Seneca coverage had been declined, cancelled or nonrenewed in the prior three years and that Safeway did *not* have a safety program. (*Id.* at SEN466 and 480).

## C. The Loss Runs

Included with the Initial Application was a loss run showing two crime claims resulting in payments by a prior carrier of $400,000 and $300,000. (*Id.* at SEN489). Hamby also sent Seneca a collection of liability loss runs for prior policy periods (the "Loss Runs") which disclosed *many* claims for violent crimes including shootings and assaults and batteries on the Properties. (Exs. 59 and 90).

If a claim did not involve a significant payment, Seneca did not consider it relevant to the underwriting process even if it involved a violent crime such as a shooting or an assault and battery. (Pluskalowski Depo., pp. 141 and 147-148). Ray Smith alleged he was shot at Tri County Shopping Center on or about November 12, 2011. (Ex. 24). This possible claim was reported to Travelers. (Ex. 23). On November 6, 2013, after Hamby submitted the Initial Application, Ray Smith filed suit against multiple defendants including Tri County (the "Smith Lawsuit"). (Ex. 24). Safeway was not named as a defendant. (*Id.*).

Hamby also sent Seneca a summary of the Loss Runs (the "Loss Run Summary") referencing Travelers Insurance Company ("Travelers") as Safeway's liability carrier for 2011 and identifying six (6) assaults and batteries including one

10597968 v4

open assault and battery with a reserve of $209,824.00.  (Ex. 61).  At no time prior to binding, did Seneca ever inquire as to any of the crimes disclosed on the Loss Runs or the Loss Summary.  (Pluskalowski Depo., p. 39, ll. 7-14).  Indeed Seneca did not even make any inquiry regarding the open claim with a reserve in excess of $200,000.00, which by Seneca's standards constituted a "severe claim."  (*Id.* at p. 144, ll. 9-12 and pp. 208, ll. 18 – p. 210, l. 6).

Seneca requires actual loss runs (not summaries) to bind coverage.  (*Id.* at p. 211, ll. 13-18).  Despite multiple references to past liability coverage by Travelers, Seneca never asked for a Travelers loss run, nor did Seneca make any inquiries regarding the numerous crimes attributed to Travelers on the Loss Run Summary. (*Id.* at pp. 207-09).  Moreover, Seneca never asked for updated loss runs and admits it did "nothing" to make sure it had updated loss information prior to binding.  (*Id.* at pp. 163, ll. 14-16, 265, ll. 15-23 and 266, ll. 11-21).

Based upon the information in the Loss Run Summary, Safeway's loss ratio (*i.e.* the percentage of premium used to pay losses) was at or near 95%.  (Ex. 154 and Knepper Depo., pp. 244-45).  To accept a risk and issue a policy, Seneca required a loss ratio of no more than 55 to 60%.  (Pluskalowski Depo., pp. 211, ll. 13-18 and 144, ll. 13-18).  Seneca considers 75% to be a "bad loss ratio" and would require additional scrutiny of an account over 50-55% at renewal.  (*Id.* at p.

10597968 v4

242, ll. 12-23). Mr. Pluskalowski ignored the information provided and erroneously calculated Safeway's loss ratio at 20%. (*Id.* at p. 40).

Thereafter, Mr. Pluskalowski calculated Safeway's premium using only the square footage of the Properties and, ignoring the loss history information provided, offering a 25% discount to incentivize acceptance and "bring the pricing to where it needed to be" to undercut the current carrier. (*Id.* at p. 60, ll. 1-15, 178, ll. 24-25 and 198, ll. 4-6).

### D. The Final Application

On January 27, 2014, Friedman went to Safeway's offices to collect Seneca's premium and obtain a signature on a final application dated January 27, 2014 (the "Final Application") prepared by Hamby. (Friedman Depo., p. 65, ll. 13-22 and Ex. 40). The Final Application did not contain Question 18. (Ex. 40). It did contain a statement that "Travelers cancelled due to losses in 2011." (*Id.* at SEN5984).

On or about November 4, 2013, there allegedly was a shooting at the Tri County Shopping Center (the "November 4 Shooting"). (Ex. 146). During the January 27, 2014, meeting, Safeway gave Friedman a letter from an attorney referencing a wrongful death claim related to the November 4 Shooting. (Friedman Depo., p. 74, ll. 18-24 and Ex. 164).

10597968 v4

Seneca did not review the Final Application, and Mr. Pluskalowski testified the Final Application "had no bearing on what we were doing." (Pluskalowski Depo., p. 224, ll. 5-9).

### E.  The Policy

On January 30, 2014, Seneca bound a policy insuring Safeway as the Named Insured and Tri County as an Additional Insured (the "Policy"). (Seneca Complaint, Ex. B). The Policy does not contain a provision entitling Seneca to recoupment of defense expenses. (*Id.*). Seneca's underwriting expert, William Knepper, stated multiple times he would ***not*** have issued the Policy given the information Seneca had in its possession. (Knepper Depo., pp. 144-145, 160 and 169).

After binding coverage, Seneca underwriters must order inspections on all properties within 48 hours and review the inspection reports within 30 days to enforce any right to rescind based upon the findings of the reports. To save money, Seneca inspected fewer than half the Properties, selected at random. (Pluskalowski Depo., at p. 72, l. 3 – p. 74, l. 8). The inspection reports referenced crimes on the Properties. (*Id.* at pp. 118-120 and 126).

### F.  The Mitchell Claim

Keith Mitchell claims he was shot at the Tri County Shopping Center on August 17, 2014 (the "Mitchell Incident" and "Mitchell Claim"). (Ex. 36, ¶ 1).

10597968 v4

On March 30, 2015, Mitchell sent correspondence to Safeway and Tri County notifying them of the Mitchell Incident (the "March 30, 2015 Letter").  (Ex. 118).  Thereafter, Mr.  Mitchell filed a lawsuit against Safeway and Tri County on April 6, 2015 (the "Mitchell Lawsuit") alleging of other crimes at the Tri County Shopping Center including the alleged Ray Smith shooting and the November 4 Shooting.  (Ex. 36, ¶¶ 16-28, 30 and 38).

Prior to receipt of the March 30, 2015 Letter, Safeway and Tri County were unaware of the alleged Mitchell Incident.  (First Shaikh Depo., p. 263).  Seneca has admitted it has no evidence Safeway or Tri County were aware of the Mitchell Incident prior to receipt of the March 30, 2015 Letter.  (Mrakovcic Depo., p. 62, l. 21 – p. 63, l. 4).

Safeway and Tri County notified Seneca of the Mitchell Incident on April 6, 2015.  (Ex. 119).  Seneca immediately set up its claim file, and the assigned adjuster, John Mrakovcic, reviewed the Mitchell Complaint, the Policy and the underwriting file including the application materials and Loss Runs evidencing crimes on the Properties.  (Mrakovcic Depo., p. 58, l. 20 – p. 60, l. 6).

On April 7, 2015, Seneca sent a letter to Safeway and Tri County (the "April 7, 2015 Letter") acknowledging the Mitchell Claim and including a boilerplate statement regarding reserving rights with no information whatsoever as to the grounds for such reservation.  (Ex. 122).  All actual reservation of rights

letters require approval by Mr. Mrakovcic's supervisor, Frank Donahue. (Mrakovcic Depo., p. 68, l. 17 – p. 69, l. 10).  The April 7, 2015 Letter was "an acknowledgment letter" and therefore did not require approval.  (*Id.* at pp. 68, l. 22 – p. 69, l. 10)

Seneca admits that as early as April 7, 2015, it was investigating possible late reporting of the Mitchell Claim.  (*Id.*at p. 40).  Seneca did not disclose this in its April 7, 2015 Letter.  (Ex. 122).  As of April 7, 2015, Seneca also had engaged an investigator to investigate matters related to both defense *and* coverage without disclosing to Safeway there were any coverage issues or that the assigned investigator was investigating Safeway to assist Seneca in a possible declination. (Mrakovcic Depo., pp. 42 and 43).  On May 1, 2015, Seneca hired the coverage counsel who eventually filed the instant action nine months later.  (Ex. 122 and Mrakovcic Depo., p. 51, ll. 16-22).

On May 5, 2015, Seneca engaged defense counsel and began defending Safeway and Tri County in the Mitchell Lawsuit.  (Ex. 115).  On May 13, 2015, Seneca sent its first reservation of rights letter, approved by Frank Donahue, identifying certain grounds for possible denial of the Mitchell Claim.  (Ex. 42 and Mrakovcic Depo., pp. 68 and 69).

10597968 v4

Seneca did not file the instant action until January 19, 2016 and did not seek to deposit the Policy premium into the registry of the Court until April 6, 2016. (Dkt. 1 and 12).

## III.   <u>ARGUMENT AND ANALYSIS</u>

Safeway and Tri County are entitled to summary judgment on each of Seneca's claims for at least the following six (6) reasons:

1. Safeway did not make any misrepresentations in its application;

2. Any alleged misrepresentation was not material;

3. Seneca waived any claimed right to rescind the Policy;

4. Safeway provided timely notice of the Mitchell Claim;

5. Seneca defended the Mitchell Claim without reserving rights; and

6. Seneca cannot recoup defense expenses for the Mitchell Claim.

## A.   <u>Legal Standard</u>

Summary judgment is proper when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The movant carries the initial burden and must show there is "an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S.Ct 2548 (1986).  "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

10597968 v4

252, 91 L. Ed. 2d 202, 106 S.Ct. 2505 (1986).  Safeway and Tri County meet this burden and are entitled to summary judgment.

**B.**    **Safeway Did Not Make Any Misrepresentations in its Application.**

**1.**    **Safeway Did Not Make Any Misrepresentation Regarding the November 4 Shooting.**

Seneca's primary argument for rescission seems to be that Safeway failed to disclose the November 4 Shooting.  This argument fails as a matter of law.  The November 4 Shooting had not occurred at the time the Initial Application was submitted and/or the Loss Runs obtained from prior carriers, and Seneca underwrote the Policy based solely upon the Initial Application materials without requesting current loss runs prior to binding.  (Pluskalowski Depo., p. 163, ll. 14-16).  Indeed, Seneca admits it did "nothing" to make sure it had current loss history information.  (*Id.*, p. 265, ll. 15-23).  Seneca's own underwriting expert did not find this practice acceptable.  (Knepper Depo., pp. 164-66).  Finally, Seneca never reviewed the Final Application which Seneca erroneously contends should have included disclosure of the November 4 Shooting in the Loss History Grid. (Pluskalowski Depo., p. 224, ll. 5-9).

**2.**    **Safeway Did Not Make Any Misrepresentations in the Loss History Grid.**

As Seneca's expert testified, not everything requested in the Loss History Grid is or could be encompassed in loss runs.  (Knepper Depo., p. 1487, ll. 1-4). The Loss History Grid submitted to Seneca leaves blank the questions regarding

10597968 v4

occurrences that may give rise to claims (*e.g.* the Ray Smith claim in the Initial Application and/or the November 4 Shooting in the Final Application). (Ex. 39 at SEN467). Indeed, it was evident to Seneca's expert the Loss History Grid contained blanks. (Knepper Depo., at p. 188, l. 21 – p. 189, l. 2). Seneca accepted an application containing unanswered questions regarding occurrences and therefore cannot deny liability based upon the missing information:

> The question is whether an insurer must honor its policy when the application was incomplete, but the insurer retained the premium and delivered the contract anyway. The vast weight of authority binds insurers to their commitments in this situation. *See* 6 Lee R. Russ Thomas F. Segalla, *Couch on Insurance* § 85:18 (3rd ed. 2005) ("When the information supplied by the insured is obviously not satisfactory or adequate, the acceptance thereof by the insurer without a protest is a waiver of the requirement of a complete or full answer.") . . . . *Bloom v. Wolfe*, 547 P.2d 934, 937 (Colo. Ct. App. 1976) ("It is well established that when an insurer accepts an application for insurance with unanswered question, liability cannot be denied on this ground.").

*Nationwide Life Ins. Co. v. Steiner*, 722 F.Supp.2d 179,186 (D.R.I. 2010). This same prohibition exists in the law in Georgia. *See e.g. Pennsylvania Life Ins. Co. v. Tanner*, 163 Ga. App. 330, 333, 293 S.E.2d 520, 522-23 (1982) (insurer obligated to read application and takes a calculated risk in issuing policy based upon application with a blank in it).

10597968 v4

### 3.    <u>Seneca Knew the Answer to Question 18 Was Incorrect.</u>

Seneca claims its decision to issue the Policy was based upon a "No" answer to question 18 which allegedly induced Seneca to believe no crimes had occurred on the Properties.  The undisputed evidence eviscerates this argument.  The Initial Application included a loss run identifying two thefts on the Properties resulting in losses of $700,000.00.  (Ex. 39, p. SEN489).  Seneca received the Loss Runs identifying shootings, assaults and batteries and other crimes.  (Exs. 59 and 90).  The Loss Run Summary disclosed the same crimes plus a severe open claim with a reserve of more than $200,000.00.  (Ex. 61).  Based upon the undisputed evidence of what Seneca received, Seneca cannot rely upon the response to Question 18 as a basis to rescind the Policy.  *Peek v. So. Guar. Ins. Co.,* 240 Ga. 498, 500, 241 S.E.2d 210, 212 ("An insurer cannot justly assert reliance upon a representation it knows to be false, or is properly charged with knowing to be false.").  Indeed, Mr. Pluskalowski admitted he knew, prior to binding, of crimes on the Properties:

> Q.    So there are three losses on this loss run totaling $708,880, correct?
>
> A.    Yes.
>
> Q.    And two out of those three losses are labeled as a theft, correct?
>
> A.    Yes.
>
> Q.    So those are crimes, correct?
>
> A.    Possibly, yes.

10597968 v4

(Pluskalowski Depo., p. 66, ll. 14-21).  Accordingly, Safeway did not misrepresent the occurrence of crimes on the Properties.

## C.      Any Alleged Misrepresentation Was Not Material.

Even assuming *arguendo* a misrepresentation was made, to rescind the Policy, such misrepresentation must be material to the risk and to Seneca's issuance of the Policy under the terms stated therein.  *Lively v. So. Heritage Ins. Co.*, 256 Ga. App. 195, 196, 568 S.E.2d 98, 100 (2002).  Materiality is determined using an objective standard of what is material to a "prudent insurer."  *Id.* Materiality, or the lack thereof, may be determined as a matter of law when there are no genuine issues of fact.  *See generally, Dracz v. Am. Gen Life Ins. Co.*, 427 F.Supp.2d 1165, 1170, (M.D.Ga. 2006) citing *Jackson Nat'l Life Ins. Co. v. Snead*, 231 Ga. App. 406, 410, 499 S.E.2d 173,176 (1998).

As Seneca ignored the loss history information submitted, it cannot now contend an alleged misrepresentation regarding Safeway's loss history to be material.  Safeway can demonstrate a lack of materiality by showing:

(a)      the insurer did not rely upon the application;

(b)      any claim by the underwriter regarding materiality is "merely a blanket statement unsupported by bright-line policies regarding the specific risk;" *or*

(c)   presenting an expert to testify as to what a prudent insurer would have done in the same circumstances.

*Dracz*, 427 F.Supp.2d at 1170.   While Safeway must show only *one* of these factors, it can evidence all three and is entitled to summary judgment on Seneca's rescission claim.

### 1.   Seneca Did Not Rely on the Application Information.

Seneca claims reliance upon the answer to Question 18 that no crimes occurred on the Properties, but as discussed in section B(3), Mr. Pluskalowski admitted he knew this response was in error.

Moreover, Seneca completely *ignored* the loss history information submitted including, but not limited to the following:

1. Loss runs with the Initial Application identifying $700,000 of paid crime claims (Ex. 39 at SEN489);

2. Loss runs sent after the Initial Application identifying multiple crimes on the Properties including shootings and assaults and batteries (Exs. 59 and 90);

3. The Loss Run Summary disclosing at least six assaults and batteries, an open claim reserved at approximately $210,000.00 and a loss ratio of approximately 95% as discussed in sections B(3) and C(2).  (Ex. 61);

4. A statement in the Initial Application that coverage previously was declined, cancelled or nonrenewed (Ex. 39 at SEN466); and

5. The Final Application stating Travelers cancelled due to losses in 2011 (Ex. 40).

10597968 v4

As shown in section B herein, there are no misrepresentations in the Initial Application or the Final Application. Moreover, Seneca knew or should have known the Loss History Grid included blanks and that the Loss Runs did not encompass all of the loss history information requested. Similarly, Seneca's argument that the Ray Smith claim was not disclosed on any loss run and such omission affected Seneca's underwriting decision fails as a matter of law. Mr. Pluskalowski testified that any disclosed claim not resulting in a significant payment was irrelevant to his analysis of the risk. (Pluskalowski Depo., pp. 141, ll. 3-19 and 147, l. 13 – p. 148, l. 3). The Smith Lawsuit was not filed until November 6, 2013 and did not name Safeway as a defendant. (Ex. 24). Even assuming *arguendo* the Smith claim should have appeared on a loss run or otherwise been disclosed, there would have been no associated cost or payment, and Mr. Pluskalowski would have ignored it. (Pluskalowski Depo., pp. 141, ll. 3-19 and 147, l. 13 – p. 148, l. 3).

Finally, leaving no room for doubt Seneca did not rely on the application materials, Mr. Pluskalowski calculated Safeway's premium using only the square footage of the Properties and then offering a 25% discount to incentivize acceptance and "bring the pricing to where it needed to be." (*Id.* at p. 60, ll. 1-15 and 178, ll. 24-25).

17

10597968 v4

## 2.    The Risk Did Not Meet Seneca's Underwriting Criteria.

Seneca's underwriting requirements which must be met for issuance of a policy include: (1) a loss ratio (*i.e.* a comparison of paid premium to cost of claims) of no more than 55 to 60%; and (2) receipt of actual loss runs for the insured as opposed to summaries.  Safeway did not meet these requirements.

Seneca had in its possession information from which it easily could determine Safeway's loss ratio was approximately 95%.  (Exs. 59, 61 and 154; Knepper Depo., pp. 244-45).  This is an extremely high loss ratio that would cause a prudent insurer to reject the risk.[1]  Indeed, as discussed in section C(3) below, Seneca's own expert would not have accepted the Safeway risk.

Second, Seneca knew, or should have known, based upon multiple references to Travelers in application documents and in the Loss Run Summary, that it did not receive the actual loss run for Travelers.  This is a significant underwriting omission by Seneca as the Loss Run Summary disclosed Travelers had an open claim reserved at approximately $210,000.00, and the Final Application stated Travelers cancelled coverage based upon losses.[2]  Without a

---

[1]  If not rejected outright, a prudent insurer might quote a very high premium or limit the coverages offered.

[2]  Mr. Pluskalowski disingenuously claims if he knew the open claim was a "rape" as stated on the actual Travelers loss run and not an "assault and battery" as described on the Loss Run Summary, it would have changed his opinion of the risk. (Pluskalowski Depo., p. 259, ll. 1-11).

10597968 v4

copy of the Travelers loss run, and given the extremely high loss ratio, Mr. Pluskalowski was not authorized to insure Safeway.

### 3. Both Underwriting Experts Testified They Would Not Have Issued the Policy with the Information in Seneca's Possession.

Richard Franklin, Safeway's underwriting expert, concluded Seneca's underwriting decisions constituted a "grievous error in judgment" and that Mr. Pluskalowski "made significant and erroneous assumptions about both crimes and Safeway's loss history." (Ex. 151, pp. 6 and 9). But Safeway does not have to rely only upon its own expert for this showing because *Seneca's* **underwriting expert stated he would not have issued the Policy given the crime and loss information provided to Seneca**.

> Q. Would you have issued the policy if you were the underwriter with four known shootings?
>
> A. I don't know the answer to that. I probably would not have.

(Knepper Depo., pp. 144, l. 25 – p. 145, l. 4). He reiterated this opinion throughout his deposition and was obviously suspicious of Pluskalowski's motives. **"I would not have written this."** (*Id.* at p. 160, ll. 8-9). "I believe that I've already testified that I, as an underwriter I probably would not have written this risk at all . . . **But then again, my bonus has nothing to do with whether or not the company writes business or doesn't write business**. . . ." (*Id.* at p. 169, ll. 7-13). Accordingly, any claim that

additional or different information would have altered Seneca's underwriting decision is without merit, and any alleged misrepresentation by Safeway is immaterial as a matter of law.

**D.** **Seneca Waived Any Claimed Right to Rescind the Policy.**

Rescission "is not favored under the law" because it is "a forfeiture of rights under an otherwise valid contract," and therefore "courts are quick to find that the right to rescind has been waived." *See generally Conway v. Romarion*, 252 Ga. App. 528, 530, 557 S.E.2d 54, 57 (2001).  An insurer waives its right to rescind if it treats a policy as valid after learning of an application misrepresentation. *Love v. Safeco Ins. Co. of Ind.,* 2013 WL 5442208 at *7 (M.D.Ga. 2013); *Florida Int'l Indem. Co. v. Osgood,* 233 Ga. App. 111, 113, 503 S.E.2d 371, 373 (1998) quoting *Haugseth v. Cotton States Mut. Ins. Co.,* 192 Ga. App. 853, 855, 386 S.E.2d 725 (1989).  Once a waiver occurs, the rescission claim cannot be revived. *Holloman v. D.R. Horton, Inc.,* 241 Ga. App. 141, 146, 524 S.E.2d 795 (1999).  An insurer must act upon its intent to rescind *immediately* upon discovery of facts supporting a rescission and adhere to such intent.   Seneca did neither and has waived any claimed right to rescind the Policy.

As discussed in section B(3), Seneca knew prior to binding the Policy that the answer to Question 18 was incorrect.  Moreover, Seneca received information regarding previously committed crimes on the Properties in the inspection reports

10597968 v4

reviewed by Mr. Pluskalowski in April of 2014.  (Pluskalowski Depo., pp. 118-120 and 126).  Thereafter, Seneca failed to act promptly with respect to the information it claims to have learned from the Mitchell Complaint.  In early April of 2015, John Mrakovcic, the claims adjuster for Seneca, reviewed the Mitchell Complaint which alleged numerous prior crimes on the Properties.  (Mrakovcic Depo., pp. 30, l. 25 – p. 32, l. 15).  *At that same time*, he also reviewed Safeway's application and accompanying loss history information.  (*Id.*).

Accordingly, in April of 2014, Seneca first was aware of facts it now claims support rescission, *i.e.* the inspection reports evidencing prior crimes on the Properties.  Inexplicably, Seneca waited *twenty-one months* to file the instant action and *two years* to deposit the Policy premium into this Court's registry.  (Dkt. Nos. 1 and 12).  Indeed, even if such time periods are calculated starting with Seneca's awareness of the Mitchell Claim, Seneca still delayed *nine months* in filing and *one year* in depositing funds.  (*Id.*).  Moreover, prior to filing the instant action, Seneca defended Safeway against the Mitchell Claim and treated the Policy as valid and binding.  This is not the immediate, unequivocal action required by Georgia law to rescind the Policy and therefore constitutes a waiver of any right to rescind.

10597968 v4

**E.    Safeway Provided Timely Notice of the Mitchell Claim.**

Seneca alleges "*If* Safeway Group and Tri County failed to provide notice as soon as practicable of the "occurrence" that resulted in the claim alleged in the [Mitchell] Lawsuit" then Seneca is entitled to a ruling it does not have to defend or indemnify Safeway and Tri County.    (Complaint, ¶ 44) (emphasis added). Notably, Seneca does not allege an actual failure, they allege merely the possibility.  Safeway and Tri County have stated unequivocally they had no notice of the Mitchell Incident or the Mitchell Claim prior to receipt of the March 31, 2015 Letter.  (First Shaikh Depo., p. 263).  There is no evidence in the record that contradicts such statements, and Seneca admits it has none.  (Mrakovcic Depo., pp. 62, l. 21 – p. 63, l. 9).  Safeway and Tri County are entitled to summary judgment, and Seneca must defend and indemnify.

**F.    Seneca Defended the Mitchell Claim Without Reserving Rights.**

Even assuming *arguendo* Seneca could evidence a failure to provide timely notice of the Mitchell Incident and/or Claim, Seneca has waived any such defense. Seneca received notice of the Mitchell Claim on April 6, 2015.  (Ex. 119).  Seneca acknowledged receipt of the Mitchell Claim in the April 7, 2015 Letter.  (Ex. 122). This letter is described by John Mrakovcic as "an acknowledgment letter" with reference to a general reservation of rights.  (Mrakovcic Depo., pp. 68, ll. 22 – 69, l. 10).  It did not contain *any* grounds for reserving rights or *any* circumstances

10597968 v4

being investigated which could lead to a denial. (Ex. 122). Because it was not intended as a reservation of rights letter, it was not reviewed or approved by Mr. Mrakovcic's supervisor as required when Seneca issues a reservation of rights. Mrakovcic Depo., pp. 68, l. 22 – 69, l. 10).[3]

Without reserving rights, Seneca engaged defense counsel on May 5, 2015, and began the defense of the Mitchell Lawsuit. (Ex. 115). At this time, Seneca was well aware of all alleged defenses to coverage and already had engaged its own coverage counsel. (Ex. 22 and Mrakovcic Depo., p. 51, ll. 16-22). It was not until May 13, 2015, that Seneca sent Safeway a reservation of rights, as approved by Mr. Mrakovcic's supervisor, identifying specific grounds for a possible denial. (Ex. 42 and Mrakovcic Depo., pp. 68, l. 22 – 69, l. 10).

To effectively preserve defenses, a reservation of rights must be made *"**prior to assuming and conducting the defense** of the action brought against its insured." State Farm Mut. Auto Ins. Co. v. Wheeler*, 160 Ga. App. 523, 526, 287

---

[3] It is important to note, the April 7, 2015 Letter, with only boilerplate language regarding reserving rights, cannot constitute a valid reservation because it does not meet the requirements of Georgia law that Seneca "fairly inform" Safeway that, notwithstanding Seneca's defense of the Mitchell Lawsuit, Seneca disclaims liability and does not waive certain defense to coverage. *World Harvest Church, Inc. v. GuideOne Mut. Ins. Co.*, 287 Ga. 149, 152, 695 S.E.2d 6, 9; *Richmond v. Ga. Farm Bur. Mut. Ins. Co.*, 140 Ga. App. 215, 217, 231 S.E.2d. 245, 247 (1976). To "fairly inform" the insured, the reservation of rights must inform the insured of the specific basis for the insurer's coverage determination. *World Harvest*, 287 Ga. at 152, 695 S.E.2d. at 9 (citing *Jacore Systs. V. Cent. Mut. Ins. Co.*, 194 Ga. App. 512, 514, 390 S.E.2d 876 (1990)).

10597968 v4

S.E.2d 281, 283 (1981) (emphasis in original).  If, as in the instant scenario, an insurer undertakes a defense without reserving rights, the insurer waives its potential defenses.  *World Harvest*, 287 Ga. 149, 156, 695 S.E.2d 6, 11 (2010); *Prescott's Altama Datsun, Inc. v. Monarch Ins. Co. of Ohio*, 253 Ga. 317, 318, 319 S.E.2d 445, 446 (1984).  Seneca engaged defense counsel and undertook the defense no later than May 5, 2015.  (Ex. 115).  Despite awareness of the allegations now contained in the instant action, Seneca did not reserve its rights until May 13, 2015.  (Ex. 42).  Accordingly, Seneca waived the defenses it now seeks to assert, and Seneca must cover the Mitchell Claim.

### G.    Seneca Cannot Recoup Defense Expenses for the Mitchell Claim.

Seneca seeks reimbursement of the defense costs for the Mitchell Claim. Georgia law does not recognize such a claim under the instant circumstances.  First and foremost, there is no provision in the Policy entitling Seneca to such relief.[4] This Court has refused to require insureds to reimburse defense fees "in the absence of a policy provision requiring reimbursement or case law instructing the Court otherwise."  *Transportation Ins. Co. v. Freedom Elecs., Inc.*, 264 F.Supp.2d 1214, 1221 (N.D.Ga. 2003).

Second, Seneca failed to timely reserve its rights with respect to defense costs.  As discussed in Section F herein, Seneca failed to reserve all rights of any

---

[4]  A true and correct copy of the Policy is attached as Ex. B to Seneca's Complaint.

24

10597968 v4

kind, including to a purported right to reimbursement of defense costs. Any entitlement to recoupment *is dependent upon a timely reservation of the right to such recoupment.*[5] *GIRMA v. City of Sandy Springs*, 337 Ga. App. 340, 346, 788 S.E.2d 74, 79-80 (2016). Seneca failed to issue such a reservation and instead defended Safeway for 8 months before seeking a declaration denying any duty to defend the Mitchell Lawsuit and ordering reimbursement of defense expenses. Accordingly, Seneca is not entitled to recoup defense expenses.

Respectfully submitted this 3rd day of January, 2017.

MORRIS, MANNING & MARTIN, LLP


    /s/ Jessica F. Pardi
Jessica F. Pardi
Georgia Bar No. 561204
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 233-7000
(404) 233-9532 (fax)
jpardi@mmmlaw.com
Attorney for Defendants/Third-Party Plaintiffs Safeway Group, Inc. and WH-Tri County Shopping Center, LLC

---

[5]  The issue of whether insurers are entitled to recoup costs in the absence of a contractual provision to that effect has not yet been decided in Georgia. *GIRMA,* 337 Ga. App. at 346, 788 S.E.2d at 79-80.

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SENECA INSURANCE COMPANY, INC. | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) CIVIL FILE NO. 1:16-CV-00174-WSD |
| SAFEWAY GROUP, INC.; WH-TRI COUNTY SHOPPING CENTER, LLC; and KEITH MITCHELL, | ) ) ) ) ) |
| Defendants. | ) ) |
| _____ | ) ) |
| SAFEWAY GROUP, INC.; WH-TRI COUNTY SHOPPING CENTER, LLC; | ) ) ) ) |
| Third-Party Plaintiffs, | ) ) |
| v. | ) ) |
| HAMBY & ALOISIO, INC., | ) ) |
| Third-Party Defendants. | ) |
| _____ | ) |

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing **SAFEWAY GROUP, INC. AND WH-TRI COUNTY SHOPPING CENTER, LLC'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was filed

10597968 v3

electronically via CM/ECF in the United States District Court for the Northern District of Georgia, with notice of same being electronically served by the Court to all attorneys of record.

This 3rd day of January, 2017.

/s/ Jessica F. Pardi
Jessica F. Pardi

10597968 v4