**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| SENECA INSURANCE COMPANY, INC. <br><br> Plaintiff, <br><br> v. <br><br> SAFEWAY GROUP, INC.; WH-TRI COUNTY SHOPPING CENTER, LLC; and KEITH MITCHELL, <br><br> Defendants. <br> _____ <br><br> SAFEWAY GROUP, INC.; WH-TRI COUNTY SHOPPING CENTER, LLC; <br><br> Third-Party Plaintiffs, <br><br> v. <br><br> HAMBY & ALOISIO, INC., <br><br> Third-Party Defendants. <br> _____ | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL FILE NO. 1:16-CV-00174-WSD <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

<u>**REPLY BRIEF IN SUPPORT OF SAFEWAY GROUP, INC. AND
WH-TRI COUNTY SHOPPING CENTER, LLC'S
MOTION FOR SUMMARY JUDGMENT**</u>

COME NOW Safeway Group, Inc. ("Safeway") and WH-Tri County Shopping

Center, LLC ("Tri County" and collectively the "Safeway Defendants") and file their

Reply Brief in Support of Summary Judgment as follows:

10679547 v2

## I.    INTRODUCTION

In its response to Safeway and WH-Tri County's motion for summary judgment (the "Seneca Response") Seneca conceded the following:  (1) Safeway provided timely notice of the Mitchell Claim; and (2) Seneca no longer seeks to recover its costs and expenses for defense of the Mitchell Lawsuit.  Accordingly, the Safeway Defendants are entitled to summary judgment on these claims (Seneca Complaint, Count III and Prayer for Relief (d)) and will limit this reply to Seneca's remaining claims, each of which fail as a matter of law.

As demonstrated in their Brief in Support of Summary Judgment (the "Safeway Brief"), the Safeway Defendants are entitled to summary judgment on Seneca's remaining claims for at least the following four (4) reasons:

1.  Safeway did not fail to disclose crimes;

2.  Any alleged misrepresentation was not material;

3.  Seneca waived any claimed right to rescind the Policy; and

4.  Seneca defended the Mitchell Claim without reserving rights.

Seneca fails to refute any of these grounds, each of which is discussed in further detail herein.

### 1.  Safeway Did Not Fail to Disclose Crimes.

The Seneca Response fails to show any material misrepresentation by the Safeway Defendants.  Seneca describes eight crimes it erroneously contends were not disclosed during the application process and purportedly were material to Seneca's

10679547 v2

decision to issue the Policy.  Seneca's contentions are false as each of the alleged crimes either *was disclosed* or is *inarguably immaterial* to Seneca's underwriting decisions.  Accordingly, Seneca's claims regarding a material misrepresentation fail as a matter of law.  Each of these crimes is now discussed in further detail as follows:

### a.  An alleged rape and kidnapping on December 9, 2011

This alleged crime was *disclosed* to Seneca on the Loss Run Summary.  (Ex. 61).

### b.  An alleged battery inside Club Ritz on June 22, 2012

This alleged incident resulted in a claim by Carlton Miller which was *disclosed* to Seneca on the Loss Runs.  (Exs. 59 and 90).

### c.  An alleged January 13, 2012, assault and battery involving Kiara Sims

This alleged crime was *disclosed* to Seneca on the Loss Run Summary (Ex. 61).

### d.  An alleged November 12, 2011, incident involving Ray Smith

Seneca's argument that the Ray Smith claim was not disclosed on any of the Loss Runs and that such omission affected Seneca's underwriting decision fails as a matter of law.  Mr. Pluskalowski testified that any disclosed claim without a significant payment was irrelevant to his analysis of the risk.  (Pluskalowski Depo., pp. 141, ll. 3-19 and 147, l. 13 – p. 148, l. 3).  The Smith Lawsuit was not filed until November 6, 2013 (*after* the Initial Application, *i.e.* the only application Seneca

10679547 v2

reviewed) and did not name Safeway as a defendant.  (Ex. 24).  Even assuming *arguendo* the Smith claim could have appeared on a loss run or otherwise been disclosed, there would have been no associated cost or payment, and Mr. Pluskalowski would have ignored it.  (Pluskalowski Depo., pp. 141, ll. 3-19 and 147, l. 13 – p. 148, l. 3).

**e.  An alleged assault inside Club Ritz on August 27, 2011;**

**f.  An alleged assault inside Club Ritz on October 15, 2012; and**

**g.  An alleged shooting at the 50 Yard Line on June 26, 2013**

The alleged crimes referenced in e–g above (assuming they occurred) could not possibly have been material to Seneca's underwriting process or decisions.  First and foremost, *no claim ever was asserted* against either of the Safeway Defendants referencing or related to any of these alleged incidents.  Moreover, there are no claimants, victims, demands or payments of any kind related to these alleged incidents.  As Mr. Pluskalowski testified numerous times, without related monetary costs and losses, an incident was not material.  *See e.g.* Pluskalowski Depo., pp. 141, ll. 3-19 and 147, l. 13 – p. 148, l. 3; p. 150, ll. 1-4; p. 154, l. 25 – p. 155, l. 4; p. 155, ll. 15-20 and p. 155, l. 25 – p. 156, l. 21.

**h.  The November 2013 Shooting**

Seneca's argument for rescission that Safeway failed to disclose the November 2013 Shooting fails as a matter of law.  The November 2013 Shooting had not occurred at the time the Initial Application was submitted and/or the Loss Runs

10679547 v2

obtained from prior carriers, and Seneca underwrote the Policy based solely upon the Initial Application materials without requesting current loss runs prior to binding or reviewing the Final Application.  (Pluskalowski Depo., p. 163, ll. 14-16 and p. 224, ll. 5-9).   Indeed, Seneca admits it did "nothing" to make sure it had current loss history information.  (*Id.*, p. 265, ll. 15-23).  Seneca's own underwriting expert did not find this practice acceptable.  (Knepper Depo., pp. 164-66).

Moreover, the Loss History Grid submitted to Seneca leaves blank the questions regarding occurrences that may give rise to claims (*e.g.* the Ray Smith incident in the Initial Application and/or the November 2013 Shooting in the Final Application).  (Ex. 39 at SEN467).  Indeed, it was evident to Seneca's expert the Loss History Grid contained blanks.  (Knepper Depo., at p. 188, l. 21 – p. 189, l. 2).  **Seneca accepted an application containing unanswered questions regarding occurrences and therefore *cannot* deny liability based upon the missing information.**  *See e.g. Pennsylvania Life Ins. Co. v. Tanner*, 163 Ga. App. 330, 333, 293 S.E.2d 520, 522-23 (1982) (insurer obligated to read application and takes a calculated risk in issuing policy based upon application with a blank in it).   In its Response, Seneca attempts to distinguish *Tanner* from the instant situation because the Court "found the insurer took a calculated risk in accepting the policy where the omission was glaring" and there was no such "glaring" omission here.  (Seneca Resp., p. 10, ftnt. 9).  Seneca's attempt fails as the "glaring omission" in *Tanner* is nothing other than blanks just as in the instant situation.

10679547 v2

Seneca goes on to admit that "Safeway did not list any specific losses or claims or occurrences" but did reference "loss runs on file with the underwriters."  (Seneca Resp., p. 11).  Seneca saw the blanks in the grid, and as acknowledged by Seneca's own expert, Seneca should know that not everything asked for in the loss history grid is going to be covered by a loss run.  (Knepper Depo., p. 187, ll. 1-4).  Not only is the box to indicate no occurrences left blank, but no specific incidents are delineated in the spaces provided.  (Ex. 39 at SEN467).  Accordingly, the only valid conclusion is information is missing since not all responsive loss history information can be contained in loss runs, and the question regarding occurrences was left blank.

Finally, Seneca claims the "No" answer to question 18 allegedly induced Seneca to believe no crimes had occurred on the Properties.  The undisputed evidence eviscerates this argument.  The Initial Application included a loss run identifying two thefts on the Properties resulting in losses of $700,000.00.  (Ex. 39 at SEN489).  Seneca received the Loss Runs identifying shootings, assaults and batteries and other crimes.  (Exs. 59 and 90).  The Loss Run Summary disclosed the same crimes plus a severe open claim with a reserve of more than $200,000.00.  (Ex. 61).  Based upon the undisputed evidence of what Seneca received, Seneca cannot rely upon the response to Question 18 as a basis to rescind the Policy.  *Peek v. So. Guar. Ins. Co.,* 240 Ga. 498, 500, 241 S.E.2d 210, 212 ("An insurer cannot justly assert reliance upon a representation it knows to be false, or is properly charged with knowing to be false.").  Indeed, as quoted in Safeway's Brief, Mr. Pluskalowski admitted he knew,

10679547 v2

prior to binding, of crimes on the Properties.  (Pluskalowski Depo., p. 66, ll. 14-21).

Accordingly, Safeway did not misrepresent the occurrence of crimes on the

Properties.

In its Response, Seneca cites to Mr. Pluskalowski's testimony regarding

possible "inside jobs" not impacting underwriting decisions.  This is ridiculous.  First

and foremost, there is no evidence the disclosed crimes were "inside jobs."  Second,

it makes no difference whether the crimes disclosed on the Loss Runs were

committed by a tenant employee, vendor or contractor.    Finally, even Mr.

Pluskalowski admitted an "inside job" is still a crime. (Pluskalowski Depo., p. 67, ll.

12-15).

## 2.  Any Alleged Misrepresentation Was Not Material.

As discussed in Section (1) above, the crimes referenced by Seneca either were

disclosed or were inarguably immaterial.   Seneca fails to refute any arguments

regarding materiality.   As evidenced in Safeway's Brief and Appendix, Seneca

ignored the loss history information submitted and it cannot now contend an alleged

misrepresentation regarding Safeway's loss history to be material.   Safeway has

demonstrated a lack of materiality by showing:

(a)   Seneca did not rely upon the application information;

(b)   Mr. Pluskalowski's statements regarding materiality are "merely a
blanket statements unsupported by bright-line policies regarding the
specific risk;" *or*

7                                                    10679547 v2

(c)     providing testimony from both sides experts stating they would not have issued the Policy.

*Dracz v. Am. Gen. Life Ins. Co*, 427 F.Supp.2d 1165, 1170 (M.D. Ga 2006).  Safeway evidenced all three factors and is entitled to summary judgment on Seneca's rescission claim.

### a.  <u>Seneca Did Not Rely on the Application Information.</u>

Seneca claims reliance upon the answer to Question 18 that no crimes occurred on the Properties, but as discussed in section 1, Mr. Pluskalowski admitted he knew this response was in error.  Moreover, Seneca completely *ignored* the loss history information submitted including, but not limited to the following:

1.  Loss runs with the Initial Application identifying $700,000 of paid crime claims (Ex. 39 at SEN489);

2.  Loss runs sent after the Initial Application identifying multiple crimes on the Properties including shootings and assaults and batteries (Exs. 59 and 90);

3.  The Loss Run Summary disclosing at least six assaults and batteries, an open claim reserved at approximately $210,000.00 and a loss ratio of approximately 95% as discussed in sections B(3) and C(2).  (Ex. 61);

4.  A statement in the Initial Application that coverage previously was declined, cancelled or nonrenewed (Ex. 39 at SEN466); and

5.  The Final Application stating Travelers cancelled due to losses in 2011 (Ex. 40).

Finally, leaving no room for doubt Seneca did not rely on the application materials, Mr. Pluskalowski calculated Safeway's premium using only the square

10679547 v2

footage of the Properties and then offering a 25% discount to incentivize acceptance and "bring the pricing to where it needed to be." (Pluskalowski Depo., at p. 60, ll. 1-15 and 178, ll. 24-25).

### b. __The Risk Did *Not* Meet Seneca's Underwriting Criteria.__

Seneca's underwriting requirements which must be met for issuance of a policy include: (1) a loss ratio (*i.e.* a comparison of paid premium to cost of claims) of no more than 55 to 60%; and (2) receipt of actual loss runs for the insured as opposed to summaries. Safeway did not meet these requirements.

Seneca had in its possession information from which it easily could determine Safeway's loss ratio was approximately 95%. (Exs. 59, 61 and 154; Knepper Depo., pp. 244-45). This is an extremely high loss ratio that would cause a prudent insurer to reject the risk. Indeed, as discussed in section (c) below, Seneca's own expert would not have accepted the Safeway risk. In its response, Seneca disingenuously attempts to minimize the relevance of an insured's prior loss ratio. (Seneca Resp., pp. 12-13). Seneca's own requirements eviscerate this false argument.

Second, Seneca knew, or should have known, based upon multiple references to Travelers in application documents and in the Loss Run Summary, that it did not receive the actual loss run for Travelers. This is a significant underwriting omission by Seneca as the Loss Run Summary disclosed Travelers had an open claim reserved

10679547 v2

at approximately \$210,000.00,[1] and the Final Application stated Travelers cancelled coverage based upon losses.  Without a copy of the Travelers loss run, and given the extremely high loss ratio, Mr. Pluskalowski was not authorized to insure Safeway.

### c. Both Underwriting Experts Testified They Would Not Have Issued the Policy with the Information in Seneca's Possession.

Richard Franklin, Safeway's underwriting expert, concluded Seneca's underwriting decisions constituted a "grievous error in judgment" and that Mr. Pluskalowski "made significant and erroneous assumptions about both crimes and Safeway's loss history." (Ex. 151, pp. 6 and 9).  Moreover, *Seneca's* **underwriting expert stated:  "I would not have written this."**  (Knepper Depo., p. 160, ll. 8-9). He reiterated this:  "I believe that I've already testified that I, as an underwriter I probably would not have written this risk at all . . . **But then again, my bonus has nothing to do with whether or not the company writes business or doesn't write business**. . . ."  (*Id.* at p. 169, ll. 7-13).  Accordingly, any claim that additional or different information would have altered Seneca's underwriting decision is without merit, and any alleged misrepresentation by Safeway is immaterial as a matter of law.

### 3. Seneca Waived Any Claimed Right to Rescind the Policy.

The cases cited by the Safeway Defendants hold that to avoid waiver, an insurer must act upon its intent to rescind *immediately* upon discovery of facts

---

[1]  This reserve is almost double the amount of premium Seneca charged and is therefore far from the "minute detail" described by Mr. Pluskalowski. (Pluskalowski Depo., p. 144, ll.1-8).

10679547 v2

supporting a rescission and adhere to such intent.  For example, the *Haugseth* case

contains the following quote:

> "If a party to a contract seeks to avoid it on the ground of fraud or mistake, he must, upon discovery of the facts, ***at once*** announce his purpose and adhere to it.  Otherwise, he can not avoid or rescind such contract."  *Gibson v. Alford,* 161 Ga. 672, 673(5), 132 S.E. 442 (emphasis added).  See also *Precision Label Indus. V. Jones,* 185 Ga.App. 161, 162(1), 363 S.E.2d 605; *Corbitt v. Harris,* 182 Ga.App. 81, 82, 354 S.E.2d 37.

*Haugseth v. Cotton States Mut. Ins. Co.*, 192 Ga.App. 853, 854, 386 S.E.2d 725, 726.

Seneca's assertion that there "was no set time period in which Seneca was obligated

to file its Petition for Rescission and Declaratory Judgment" (Seneca Response, p. 22)

is demonstrably false.  This requirement for immediate action is necessary so an

insured can protect itself and take all actions necessary to avoid having its coverage

retroactively eviscerated thereby leaving the insured unexpectedly without coverage.

Seneca's delay in seeking rescission fails to meet this legal requirement, and thus

Seneca waived any purported right to rescind the Policy.  Indeed, the cases cited in

the Seneca response are inappropriate and easily distinguishable as each *such case*

*pertains solely to delay in seeking a declaratory judgment regarding coverage as*

*opposed to rescission of a policy* as Seneca demands in the instant action.

As discussed in section B(3) of the Safeway Brief, and section 1 herein, Seneca

knew *prior to binding the Policy* that the answer to Question 18 was incorrect.

Seneca received information regarding previously committed crimes on the

Properties in the inspection reports reviewed by Mr. Pluskalowski in April of 2014.

10679547 v2

(Pluskalowski Depo., pp. 118-120 and 126).  Thereafter, in early April of 2015, John Mrakovcic, the claims adjuster for Seneca, reviewed the Mitchell Complaint which alleged numerous prior crimes on the Properties.  (Mrakovcic Depo., pp. 30, l. 25 – p. 32, l. 15).  *At that same time*, he also reviewed Safeway's application and accompanying loss history information.  (*Id.*).  Seneca failed to act promptly with respect to the information it claims to have learned from the Mitchell Complaint.  Indeed, Seneca honored the Policy and led Safeway to believe it would remain in full force and effect until filing the instant action.

Inexplicably, Seneca waited *twenty-one months* after receipt of the inspection reports to file the instant action (Dkt. No. 1).  This same factual scenario was examined in *Love v. Safeco Ins. Co. of Indiana,* 2013 WL 5442208 (M.D.Ga. 2013) (Safeway Brief, p. 20).  There, after issuing a policy, Safeco conducted further review of the insured (akin to Seneca's inspections) which revealed additional loss history information.  *Love*, 2013 WL 5442208 at *6.  Safeco kept the policy in effect for approximately one month after learning this information and then tried to void the policy after a loss occurred during that month.  The court held Safeco's actions during that month, with knowledge of a material misrepresentation, constituted a waiver of the right to void the policy.  *Id.* at *7.

Finally, even if such time periods are calculated starting with Seneca's awareness of the Mitchell Claim, Seneca still delayed *nine months* in filing.  (*Id.*).  Moreover, prior to filing the instant action, Seneca defended Safeway against the

10679547 v2

Mitchell Claim and treated the Policy as valid and binding. This is not the immediate, unequivocal action required by Georgia law to rescind the Policy and therefore constitutes a waiver of any right to rescind.

### 4. Seneca Defended the Mitchell Claim Without Reserving Rights.

Now realizing it failed to reserve rights before defending, Seneca disingenuously tries to recharacterize its self-described "acknowledgment letter" as a reservation of rights. The evidence in the record and the relevant case law render such assertion meritless.

Seneca acknowledged receipt of the Mitchell Claim in the April 7, 2015 Letter. (Ex. 122). This letter is described by John Mrakovcic as "an acknowledgment letter" with reference to a general reservation of rights. (Mrakovcic Depo., pp. 68, ll. 22 – 69, l. 10). It did not contain *any* grounds for reserving rights or *any* circumstances being investigated which could lead to a denial. (Ex. 122). Because it was not intended as a reservation of rights letter, it was not reviewed or approved by Mr. Mrakovcic's supervisor as required when Seneca issues a reservation of rights. (Mrakovcic Depo., pp. 68, l. 22 – 69, l. 10).

The April 7, 2015 Letter, with only boilerplate language referencing reserving rights, cannot constitute a valid reservation because it does not meet the requirements of Georgia law that Seneca "fairly inform" Safeway that, notwithstanding Seneca's defense of the Mitchell Lawsuit, Seneca disclaims liability and does not waive certain defense to coverage. *World Harvest Church, Inc. v. GuideOne Mut. Ins. Co.*, 287 Ga.

149, 152, 695 S.E.2d 6, 9; *Richmond v. Ga. Farm Bur. Mut. Ins. Co.*, 140 Ga. App. 215, 217, 231 S.E.2d. 245, 247 (1976). To "fairly inform" the insured, the reservation of rights must inform the insured of the specific basis for the insurer's coverage determination. *World Harvest*, 287 Ga. at 152, 695 S.E.2d. at 9 (citing *Jacore Systs. v. Cent. Mut. Ins. Co.*, 194 Ga. App. 512, 514, 390 S.E.2d 876 (1990)). [2]

Without reserving rights, Seneca engaged defense counsel on May 5, 2015, and began the defense of the Mitchell Lawsuit. (Ex. 115). At this time, Seneca was well aware of all alleged defenses to coverage and already had engaged its own coverage counsel. (Ex. 22 and Mrakovcic Depo., p. 51, ll. 16-22). It was not until May 13, 2015, that Seneca sent Safeway a reservation of rights, as approved by Mr. Mrakovcic's supervisor, identifying specific grounds for a possible denial. (Ex. 42 and Mrakovcic Depo., pp. 68, l. 22 – 69, l. 10).

To effectively preserve defenses, a reservation of rights must be made *"**prior to assuming and conducting the defense** of the action brought against its insured."* *State Farm Mut. Auto Ins. Co. v. Wheeler*, 160 Ga. App. 523, 526, 287 S.E.2d 281, 283 (1981) (emphasis in original). If, as in the instant scenario, an insurer undertakes a defense without reserving rights, the insurer waives its potential defenses. *World Harvest*, 287 Ga. 149, 156, 695 S.E.2d 6, 11 (2010); *Prescott's Altama Datsun, Inc.*

---

[2] Seneca tries to convert the acknowledgment letter into a reservation of rights letter by citing cases which state an insurer is not required to list in a reservation of rights 'each and every basis for contesting coverage." (Seneca Response, p. 23). That may be true, but an insurer cannot fail to assert *any* basis for contesting coverage and rely upon such communication to reserve its rights to do so later.

10679547 v2

*v. Monarch Ins. Co. of Ohio*, 253 Ga. 317, 318, 319 S.E.2d 445, 446 (1984). Seneca engaged defense counsel and undertook the defense no later than May 5, 2015. (Ex. 115). Despite awareness of the allegations now contained in the instant action, Seneca did not reserve its rights until May 13, 2015. (Ex. 42). Accordingly, Seneca waived the defenses it now seeks to assert, and Seneca must cover the Mitchell Claim.

Respectfully submitted this 7th day of February, 2017.

MORRIS, MANNING & MARTIN, LLP


/s/ Jessica F. Pardi
Jessica F. Pardi
Georgia Bar No. 561204
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404) 233-7000
(404) 233-9532 (fax)
jpardi@mmmlaw.com
Attorney for Defendants/Third-Party Plaintiffs Safeway Group, Inc. and WH-Tri County Shopping Center, LLC

10679547 v2

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SENECA INSURANCE COMPANY, INC. | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) CIVIL FILE NO. 1:16-CV-00174-WSD |
| SAFEWAY GROUP, INC.; WH-TRI COUNTY SHOPPING CENTER, LLC; and KEITH MITCHELL, | ) ) ) ) ) |
| Defendants. | ) ) |
| _____ | ) ) |
| SAFEWAY GROUP, INC.; WH-TRI COUNTY SHOPPING CENTER, LLC; | ) ) ) |
| Third-Party Plaintiffs, | ) ) |
| v. | ) ) |
| HAMBY & ALOISIO, INC., | ) ) |
| Third-Party Defendants. | ) |
| _____ | ) |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **REPLY BRIEF IN SUPPORT OF SAFEWAY GROUP, INC. AND WH-TRI COUNTY SHOPPING CENTER, LLC'S MOTION FOR SUMMARY JUDGMENT** was filed electronically via CM/ECF in the United States District Court for the Northern

10679547 v1

District of Georgia, with notice of same being electronically served by the Court to all attorneys of record.

This 7th day of February, 2017.

/s/ Jessica F. Pardi
Jessica F. Pardi

10679547 v2